RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0381a.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

JOHN B., et al.,

               *Plaintiffs-Appellees,*

     *v.*

DAVE GOETZ, Commissioner, Tennessee
Department of Finance and Administration;
DARIN GORDON, Deputy Commissioner,
Bureau of TennCare; VIOLA MILLER,
Commissioner, Tennessee Department of
Children's Services,

               *Defendants-Appellants.*

No. 09-6145

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 98-00168—William J. Haynes, Jr., District Judge.

Argued: April 27, 2010

Decided and Filed: December 16, 2010

Before: GIBBONS, ROGERS, and KETHLEDGE, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:** Michael W. Kirk, COOPER & KIRK, PLLC, Washington, D.C., for
Appellants. Andrew R. Dunlap, KIRKLAND & ELLIS LLP, New York, New York, for
Appellees. **ON BRIEF:** Michael W. Kirk, Charles J. Cooper, Brian S. Koukoutchos,
Derek L. Shaffer, COOPER & KIRK, PLLC, Washington, D.C., Robert E. Cooper, Jr.,
Linda A. Ross, OFFICE OF THE ATTORNEY GENERAL, STATE OF TENNESSEE,
Nashville, Tennessee, for Appellants. Andrew R. Dunlap, Katherine L. McDaniel,
KIRKLAND & ELLIS LLP, New York, New York, Michele M. Johnson, G. Gordon
Bonnyman, Jr., TENNESSEE JUSTICE CENTER, Nashville, Tennessee, for Appellees.

———————————————

**AMENDED OPINION**

———————————————

PER CURIAM.[1]   This appeal arises from the district court's denial of defendants' motion to vacate a consent decree entered in a 1998 class-action challenge to Tennessee's managed care program, TennCare, under the Medicaid Act.  Plaintiffs alleged that defendants, Tennessee officials charged with implementing TennCare, failed to provide early and periodic screening, diagnosis and treatment (EPSDT) services in violation of the Medicaid Act, and the parties' consent decree imposes systemic remedies for these alleged violations.  Defendants argue that the consent decree must be vacated under Federal Rule of Civil Procedure 60(b) because this court's intervening decisions render such systemic remedies unenforceable.  Defendants also request reassignment of the case.  We decline to vacate the consent decree in its entirety, but we vacate a portion of the consent decree in light of intervening decisions, and we remand the case for reassignment and further proceedings.

I.

In 1998, plaintiffs filed this 42 U.S.C. § 1983 class-action suit "on behalf of the more than half million children throughout Tennessee who depend on TennCare for essential medical and mental health services."  The case was originally assigned to Judge John T. Nixon.  Plaintiffs alleged that they were individually denied care and that TennCare is systemically deficient in providing EPSDT services, information about those services, and adoption assistance.  Plaintiffs' claims were primarily based on Medicaid's EPSDT provision, 42 U.S.C. § 1396a(a)(43), which states that

A state plan for medical assistance must . . . provide for

(A) informing all persons in the State who are under the age of 21 and who have been determined to be eligible for medical assistance including

———————————————

[1]This opinion is styled Per Curiam because it was prepared in the chambers of more than one judge.

> services described in section 1396d(a)(4)(B) of this title, of the availability of early and periodic screening, diagnostic, and treatment services as described in section 1396d(r) of this title and the need for age-appropriate immunizations against vaccine-preventable diseases,
> (B) providing or arranging for the provision of such screening services in all cases where they are requested,
> (C) arranging for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by such child health screening services, and
> (D) reporting to the Secretary . . . [particular] information relating to early and periodic screening, diagnostic, and treatment services provided under the plan during each fiscal year.

The parties negotiated a consent decree and the district court accepted that decree in May of 2000. The consent decree requires defendants to provide screening, diagnosis, and treatment services; specifies the scope of those services; requires coordinating EPSDT and other services; and establishes monitors for compliance. One consent decree provision requires geographic comparability in the availability of services under 42 U.S.C. § 1396a(a)(30). Another provision states that, "[w]here a specific residential placement is recommended [for treatment], and there is a waiting period for such placement, during the interim [a managed care organization] . . . may not simply place the child on a wait listing for the specific residential placement." The decree permits "[e]ither party [to] seek modification . . . as permitted by existing law," and specifically states that

> This consent decree is premised upon the assumption that the EPSDT requirements of 42 U.S.C. § 1396a(a)(43) and 1396d(r), and 42 U.S.C. §§ 671(a)(16) and 671(1) and (5) of the Adoption Assistance Act are enforceable in an action under 42 U.S.C. § 1983. Defendants do not waive any right to seek modification of this consent decree if controlling preceden[t] establishes a lack of § 1983 enforceability as to any of these provisions.

In December of 2001, the district court determined that defendants were not in compliance with the consent decree and EPSDT requirements, and appointed a special master to assist the parties in addressing TennCare's deficiencies. In August 2004, plaintiffs moved for further relief. On October 22, 2004, the district court entered a second order finding the defendants noncompliant. That order was set aside on

December 13, 2005.  In February of 2006, after the defendants alleged that Judge Nixon had engaged in improper ex parte communications with the special master, Judge Nixon voluntarily recused himself and the case was reassigned to Judge William J. Haynes, Jr. In March of 2006, Judge Haynes relieved the special master of his special master's duties, but retained the special master as a technical advisor under the district court's inherent authority and barred inquiry into the special master's ex parte communications with Judge Nixon.  Defendants moved the district court to reconsider this ruling, primarily arguing that the special master's appointment as technical advisor was inappropriate given the allegations of improper ex parte communications and the court's ruling that the defendants could not investigate these communications.  Defendants also noted that relief beyond that granted in the consent decree "could not be predicated, even in theory, upon any violations of underlying EPSDT law because recent jurisprudence from the Supreme Court makes clear that the Medicaid statute in this context does not confer a right that is privately enforceable by the beneficiaries."   To support this argument, defendants cited *Gonzaga University v. Doe*, 536 U.S. 273, 282 (2002), in which the Supreme Court held that "it is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of [§ 1983]."  Therefore that statute is enforceable under § 1983 only if "Congress intended to confer individual rights upon a class of beneficiaries."  *Id.* at 285.

In a hearing on April 17, 2006, the district court denied defendants' motion for reconsideration and stated that appointing the former special master as technical advisor avoided "los[ing] the benefit of [his] extensive study and review of the matters."  The district court rejected defendants' *Gonzaga*-based argument because defendants had not analyzed *Gonzaga* in their filing and the Sixth Circuit had not applied *Gonzaga* to the Medicaid Act.  The district court also noted that a motion under Federal Rule of Civil Procedure 60(b) was the appropriate method for a *Gonzaga*-based challenge to the consent decree, but that defendants had failed to make a Rule 60(b) motion and that such a motion would be untimely at that point, more than one year after *Gonzaga* was decided.

In July of 2006, this court applied *Gonzaga* to decide a § 1983 challenge to Michigan's compliance with EPSDT provisions in *Westside Mothers v. Olszewski*, 454 F.3d 532 (6th Cir. 2006)  (*Westside Mothers II*). In *Westside Mothers II*, plaintiffs claimed that the state had violated the Medicaid Act by

> (1) refusing to provide, and not requiring participating HMOs to provide, the comprehensive examinations required by 42 U.S.C. §§ 1396a(a)(43), 1396d(r)(1) and 42 C.F.R. § 441.57; (2) not requiring participating HMOs to provide the necessary health care, diagnostic services, and treatment required by 42 U.S.C. § 1396d(r)(5); (3) not effectively informing plaintiffs of the existence of the screening and treatment services, as required by 42 U.S.C. § 1396a(a)(43); (4) failing to provide plaintiffs the transportation and scheduling help needed to take advantage of the screening and treatment services, as required by 42 U.S.C. § 1396a(a)(43)(B) and 42 C.F.R. § 441.62; and (5) developing a Medicaid program that lacks the capacity to deliver to eligible children the care required by 42 U.S.C. §§ 1396a(a)(8), 1396a(a)(30)(A), and 1396u-2(b)(5).

*Id.* at 536.  We affirmed the district court's conclusion that plaintiffs had failed to state a claim upon which relief could be granted for defendants' "alleged failure . . . to ensure the actual provision of, or arrangement for, medical services." *Id.* at 539–41.  Although states must "provide for making medical assistance available," 42 U.S.C. § 1396a(a)(10), and "provide that . . . medical assistance . . . be furnished with reasonable promptness to all eligible individuals," 42 U.S.C. § 1396a(a)(8), we held that a state's obligation is only to pay for services actually rendered, not to ensure the reasonably prompt provision of services, because the Medicaid Act defines "medical assistance" as "payment of part or all of the cost of the [enumerated] services," 42 U.S.C. § 1396d(a).[2]  *Id.* at 540 (insertion in original).  We also dismissed plaintiffs' claim that would require the State to ensure comparable service availability because the underlying provision, 42 U.S.C. § 1396a(a)(30), was not privately enforceable under § 1983. *Id.* at 541–43.  However, we also held that plaintiffs' allegation that defendants "'refused or failed to *effectively*

---

[2]The definition of "medical assistance" has changed since we decided *Westside Mothers II*, but the new definition does not affect this holding because a state may still fulfill its Medicaid obligations by paying for services.

*inform* Plaintiffs and their caretakers of the existence of [EPSDT services]'" stated a claim for relief for violation of 42 U.S.C. § 1396a(a)(43). *Id.* at 543–44.

In November of 2006, five months after *Westside Mothers II* was decided, defendants in this case moved to vacate the consent decree under Federal Rule of Civil Procedure 60(b). Eleven months later, the district court issued an opinion noting that it had addressed defendants' arguments in its April 17, 2006, hearing and denied a motion on that basis, and that the defendants had not appealed that ruling. Further, the court stated that "the pendency of a dispositive motion does not stay discovery," and

> [i]f the Defendants had not been so intransigent on discovery issues requiring extraordinary amounts of the Court's time, there would have been a ruling on the motion to vacate. The Court will continue its research on that motion, but the Court also has to give attention to other actions on this Court's docket because rulings in other actions have been delayed because of the extraordinary amount of time the Court has had to expend on the [electronic discovery] issues in this action.

In March of 2009, this court decided *Brown v. Tennessee Department of Finance & Administration*, 561 F.3d 542 (6th Cir. 2009). *Brown* concerned a § 1983 suit by mentally disabled plaintiffs who alleged that Tennessee had violated the Medicaid Act by failing to provide (1) medical assistance adequate in amount, duration, and scope; (2) a choice between services; (3) reasonably prompt Medicaid application information; (4) reasonably prompt service; (5) due process in service denials. *Id.* at 543–44. In the parties' settlement, Tennessee agreed to "overhaul its administrative system, expand funding and programs for the mentally disabled, and develop program infrastructure with the goal of increasing program enrollment and substantially reducing or eliminating the waiting list for waiver services." *Id.* at 544. After *Westside Mothers II*, Tennessee moved to vacate the settlement under Rule 60(b)(5). In *Brown*, this court declined to vacate the entire agreement because the record did not "conclusively show" that the decree was primarily aimed at ensuring the provision of care and eliminating waiting lists, goals unenforceable after *Westside Mothers II*. *Id.* at 547. We did, however, vacate provisions that obligated Tennessee to eliminate waiting lists and stated that, under *Westside Mothers II*, "absent more, a waiting list for waiver services does not

violate federal law because the state's duty is to pay for services, not ensure they are provided." *Id.* at 545. We also vacated Tennessee's commitment to develop "provider network capacity" because that commitment "d[id] not appear to remedy any violation of federal law" after we held in *Westside Mothers II* that Medicaid's comparable service-availability provision was not enforceable under § 1983. *Id.* at 548.

Three months after *Brown*, in May of 2009, defendants in this case moved in the district court to ascertain the status of their post-*Westside Mothers II* motion to vacate the consent decree. The district court referred the parties to the note in its October 9, 2007 opinion. Defendants then petitioned this court for writ of mandamus ordering the district court to rule on the motion to vacate. On September 15, 2009, this court noted that "we cannot conclude mandamus should be denied based on the petitioners' filings alone" and "ordered . . . the district court to state in writing, within 60 days of the entry of this order, any reason that this petition should not be granted."

Three days later, the district court held that neither *Westside Mothers II* nor *Brown* required vacating or modifying the consent decree. *John B. v. Goetz*, 661 F. Supp. 2d 871, 903 (M.D. Tenn. 2009). The district court noted that "*Westside Mothers II* expressly recognized an enforceable right under Section 1396a(a)(43)(A) for the State Defendants' ineffective outreach services in failing to inform plaintiffs of mandated medical services under the Medicaid Act" and declined to vacate the consent decree's information and outreach provisions. *Id.* at 890. The district court acknowledged our statement in *Brown*, that "absent more, a waiting list for waiver services does not violate federal law," *id.* at 896 (quoting *Brown*, 561 F.3d at 545), but declined to vacate the consent decree's requirements for the provision of EPSDT services in the present case because "*Brown* decided only the 'waiting list' and 'provider network' claims in the context of the 'medical assistance' and 'reasonable promptness' clauses in Section 1396a(a)(8)(A)," *id.* at 897. The district court concluded that the consent decree remained enforceable without modification because the statutory text, legislative history, and accompanying regulations indicated congressional intent to establish an enforceable right to EPSDT services and because "the provisions of the decree are not premised on

a duty to provide network adequacy or to terminate waiting lists subsequently eliminated as discussed in *Westside Mothers II* and *Brown*." *Id.* at 900–03.  Defendants appeal this decision.

II.

Defendants' argument for vacating the consent decree proceeds along two lines. First, defendants focus upon an assertion that the Medicaid statute as a whole does not confer individually enforceable rights.  The statute, they point out, uses grant-conditioning language, not rights-creating language.  And, they say, the EPSDT provisions implicated in the consent decree provide for systemwide programmatic regulation of the state's program.  Defendants rely on the Fifth Circuit opinion in *Frazar v. Gilbert*, 300 F.3d 530, 544 (5th Cir. 2002), *rev'd on other grounds sub nom. Frew v. Hawkins*, 540 U.S. 431 (2004).  Defendants also look to the content of the consent decree to argue that it addresses systemic concerns rather than provides a vehicle for enforcement of individual rights.  Second, defendants examine individually the primary statutory provisions on which the consent decree and plaintiffs' claims are based in an effort to show that none of them is privately enforceable.

Defendants' first line of argument has considerable support in the language of the statute.  But in *Westside Mothers II* our court implicitly rejected such a broad view by assuming that some provisions of the statute may indeed be privately enforced and by examining individual provisions of the statute to determine whether a private right of action exists under each portion.  Most importantly, for purposes of this case, the panel in *Westside Mothers II* permitted plaintiffs' claim for relief under 42 U.S.C. § 1396a(a)(43)(A), a provision implicated in this case, to go forward.  Moreover, in *Brown*, which presented a procedural posture identical to this case, we refused a request to vacate a consent decree in a suit brought by mentally disabled Tennessee residents under the Medicaid statute, in part because it was unclear from the record whether *Westside Mothers II* completely undermined the settlement.  The court in *Brown* noted the absence of any record of settlement discussions or pre-settlement statements to the court and uncertainty about the basis and meaning of the decree.  The panel adopted the

approach of vacating portions of the consent decree that were based on provisions deemed unenforceable in *Westside Mothers II.  Brown,* 561 F.3d at 547–48.

Here, it seems evident that the provisions of 42 U.S.C. § 1398a(a)(43) are an important basis for the decree.  We thus have no indication that the decree as a whole is undermined to such an extent that it should be set aside in its entirety.  Given the counsel of *Brown* and taking into account that this court implicitly determined in *Westside Mothers II* that at least one of the requirements of § 1396a(a)(43)—that contained in § 1396a(a)(43)(A)—may be enforced through an action under 42 U.S.C. § 1983, we conclude that setting aside the decree in its entirety is unwarranted at this time.

We turn to an examination of  specific portions of the statute in an effort to determine private enforceability.  This is the teaching of *Westside Mothers II* and also the approach defendants undertake in their second line of argument.  Although defendants argue that this analysis also requires vacating the consent decree in its entirety, we disagree.  Instead,  we  follow *Brown*'s narrow approach of vacating those provisions of the decree based on portions of the statute not privately enforceable under *Westside Mothers II.*[3]  Using this approach, and because *Westside Mothers II* holds that 42 U.S.C. § 1396a(a)(30) is not privately enforceable under § 1983, 454 F.3d at 541–43, we vacate the consent decree's requirement that defendants ensure that the availability of services is geographically comparable and any other provisions based on § 1396a(a)(30).  Beyond this one provision, the status of other provisions of the decree remains uncertain.

One open question is the extent to which *Westside Mothers II*'s holding that a state's obligation under §§ 1396a(a)(8) and (10) is only to pay for medical assistance may be applicable to the provisions of § 1396a(a)(43) not addressed in *Westside Mothers*

---

[3]We limit the scope of relief to the remedies for underlying rights that have been rendered unenforceable by changes in controlling precedent.  *See* Consent Decree ¶ 15.  To the extent that defendants' first argument for vacating the entire decree is based on an argument that the decree's systemic remedies are not privately enforceable, this reasoning does not correctly appreciate the distinction between rights and remedies.  To determine whether a statute is enforceable under § 1983, courts examine "whether Congress intended to create a federal right," *Gonzaga*, 536 U.S. at 283, not the scope of the relief sought or granted.  In other words, remedies vindicating individual rights may be both systemic and nonsystemic; the form of relief says nothing about the nature of the right.

*II*. The answer to this question  could potentially impact the provisions of the consent decree that require actual provision of service rather than simply payment.  Another issue relates to whether *Westside Mothers II*'s determination about waiting lists is applicable to the waiting list provision of § 1396a(a)(43)(C).  Finally, *Westside Mothers II* only addresses one part of § 1396a(a)(43) and leaves unresolved the private enforceability of the remaining part.  While we could undertake an analysis of each of these issues, we believe that they are best left to the district court in the first instance, after an opportunity for supplemental briefing on remand.

Another distinct issue, as yet unmentioned, is the question of the private enforceability of the Adoption Assistance Act, 42 U.S.C. §§ 671(a)(16), 675(1), and 675(5).  While we easily conclude that the statute, which requires the state to develop a "case plan" and a "case review system" for each child, does not create enforceable rights, we cannot so easily ascertain the extent to which the decree is based on provisions of the Adoption Assistance Act.  This issue is also best resolved on remand where the district court can make an initial decision about whether any provisions of the consent decree must be set aside because the Adoption Assistance Act cannot be enforced under § 1983.[4]

### III.

Defendants request that this case be reassigned to another judge.  We grant the request.

A number of aspects of this case inform our decision.  First, the appearance of justice is compromised.  The district court's view of the history of this litigation, as outlined in the order from which defendants appeal, reflects a fundamental misunderstanding of the import of certain key events in the case.  Although the issues raised by the motion to vacate the consent decree have nothing to do with defendants' compliance or noncompliance with it, the district court thought it important to recount

---

[4]We recognize that ¶¶ 84-93 refer to children in custody but are uncertain whether any of the requirements of those paragraphs are based in part on the Medicaid statute. *See* Consent Decree ¶ 11 (addressing overlapping coverage).

its version of the compliance history in great detail. It quotes at length from the decree itself, Judge Nixon's 2001 order finding noncompliance, and Judge Nixon's October 2004 order finding noncompliance. It also relies on Judge Nixon's comments regarding compliance in his February 2006 recusal order. Yet nowhere does the court mention that Judge Nixon subsequently set aside the October 2004 order, that the parties jointly requested that the order be set aside, that the findings and conclusions of that order had been placed in jeopardy by the issues concerning ex parte communication by the court with the special master (communication that arguably formed a basis for the order), or that no ruling on plaintiffs' 2004 motion for further relief has ever been made. Additionally, the order reflects no recognition that, despite an effort at disclaimer, Judge Nixon's comments about compliance in the recusal order were largely a restatement of his views expressed in the order that had been set aside. Instead, the district court's order simply treats the findings of the October 2004 order as unquestioned fact. The district court also quotes at length from the report of the monitors it appointed. Although this report has never acquired any evidentiary status in the case, has never been found accurate, and has never been subjected to any adversarial process, and although defendants' objections to it remain pending, the report too is treated as unquestioned fact. Even more seriously, the historical recitation regarding compliance is not included merely as background. The court uses it as a part of its analysis of why plaintiffs have privately enforceable claims under § 1396a(a)(43). For example, the court notes that "[p]laintiffs' outreach claims under Section 1396a(a)(43) are enforceable because more than half of the 500,000 plus class members have been effectively denied outreach services rendering their rights to EPSDT service worthless." *John B.*, 661 F. Supp.2d at 893 (M.D. Tenn. 2009). The opinion also contains a number of other inaccuracies relating to defendants' perceived lack of cooperation with the court, including its references to defendants' failure to prepare the IWP or IAP and defendants' failure to respond to the remedial plan prepared by the special master and attached by Judge Nixon to the October 2004 order.

Beyond the order from which defendants now appeal, the orders issued by the district court relating to discovery contain increasingly accusatory language directed at

the defendants. While discovery orders often require that a court make findings about a party's cooperation or lack of cooperation during the discovery process and may involve imposition of sanctions, such orders should issue in an atmosphere where all parties are assured that the court has not formed preconceived opinions detrimental to either side. The district court's skewed view of the actual state of the record with regard to defendants' noncompliance with the consent decree creates an appearance that its judgment could be flawed with respect to defendants' compliance with discovery.

Second, the history of the case reveals an alarming lack of timely progress toward resolving plaintiffs' August 2004 motion for further relief and no progress at all toward the ultimate resolution of this case filed in 1998. Defendants' November 2006 motion to vacate the consent decree had been pending almost three years before a ruling. Meanwhile, extensive discovery with no predictable conclusion has been ongoing, and discovery skirmishes have consumed the district court's time. The overall picture is one of a case without direction or deadlines for resolution of primary issues. We are quite aware that defense counsel have pursued a strategy of contention that contributes substantially to the complexity of this litigation and creates challenges for the court. At the same time, complexity has in recent years also been a product of the scope of discovery sought by plaintiffs and permitted by the district court. And responsibility for moving a case forward lies primarily with the presiding judicial officer, rather than the parties.

Third, we have found it necessary to intervene in the case to an unusual extent. In June 2008, we granted a partial writ of mandamus—an extraordinary remedy required to curb discovery extraordinary in its intrusiveness. The ruling on the motion to vacate occurred only after another petition for writ of mandamus produced a directive to the district court to respond as to why the writ should not be granted. And in February of this year, we stayed all proceedings in the district court pending resolution of this appeal, following more discovery disputes and unproductive turmoil in the district court.

In reassigning this case, we are mindful that such reassignments are rare and should be made reluctantly. *Solomon v. United States*, 467 F.3d 928, 935 (6th Cir.

2006).  And we recognize the factors that govern whether such a request should be granted: "(1)whether the original judge would reasonably be expected to have substantial difficulty in putting out of his or her mind previously expressed views or findings, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *Id.*

The first factor may well favor reassignment, given that the district court appears to have held its misconceptions about the record for some time, but the second factor quite clearly supports reassignment.  And the case management difficulties we have previously noted mean that a reassignment could hardly result in waste and duplication that outweigh any gain.  In fact, reassignment provides an opportunity to reduce waste and move the case toward definitive resolution of the primary issues, as well as to enhance the appearance of fairness.

We are mindful that as appellate judges, we cannot manage litigation as trial judges do.  But despite our recognition of our role, there are occasions when we must intervene.  The plaintiff class is certainly not benefitting from the pace of this litigation.  Nor are the taxpayers of the State of Tennessee, who have borne the costs of a special master, monitors, implementation of the consent decree, attorneys' fees for plaintiffs, and fees and expenses of defense counsel.  Public-interest concerns are present for all parties.  This situation combines serious management failures, fundamental misunderstandings that potentially prejudice defendants, and a developing adversarial relationship between the judge and the defendants.  Here, the unusual decision to reassign the case is justified.

We direct that the case be reassigned promptly to a judicial officer who can give it the attention it requires.  We are aware of a vacancy in the district court.  If the need to reassign the case within the district poses a hardship, the chief judge of the district court may ask the chief judge of our court to make an appropriate designation. Upon reassignment, the new judge should undertake to resolve the issues identified by this opinion and also develop a schedule for determining any further relief to which the

plaintiffs are entitled.  Of necessity, the latter determination will require a review of the scope of current discovery and likely an insistence that the parties make choices about discovery priorities in order to meet the court's deadlines.  Going forward, resolution of key issues should govern progress in the case.

IV.

For the foregoing reasons, we vacate the portion of the consent decree based on 42 U.S.C. § 1396a(a)(30), and remand for reassignment and further proceedings.