NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0369n.06

No. 21-5826

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

WILLIAM F. NORED and LAWANDA JEAN
NORED, as conservators, parents, and next friends
of WILLIAM F. NORED, JR. (BILL), individually

       Plaintiffs-Appellants,

v.

TENNESSEE DEPARTMENT OF
INTELLECTUAL & DEVELOPMENTAL
DISABILITIES; COMMISSIONER BRAD
TURNER, in his official capacity as the
Commissioner of the Tennessee Department of
Intellectual & Developmental Disabilities,

       Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
Sep 09, 2022
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF TENNESSEE

OPINION

Before: CLAY, GRIFFIN, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Plaintiffs-Appellants William F. Nored ("Mr. Nored") and LaWanda Jean Nored ("Mrs. Nored"), collectively "the Noreds," are the parents, conservators, and next friends of their son, William F. Nored, Jr. ("Bill"). They appeal the district court's determination that Defendants-Appellees Tennessee Department of Intellectual and Developmental Disabilities, and its Commissioner, Brad Turner—collectively "DIDD"—did not violate the Americans with Disabilities Act, Rehabilitation Act, Medicaid Act, or 42 U.S.C. § 1983 by failing to find a willing home-care provider for Bill, who is entitled to that service under the Medicaid waiver program. We affirm.

**I.**

**A.**

The Noreds adopted Bill in 1970 when he was an infant. Bill is now in his fifties.

When Bill was still an infant, the Noreds began to notice that he suffered from chronic seizures. After Bill's first grand mal seizure at approximately eighteen months old, doctors performed a myelogram and determined that Bill had an extensive brain injury that likely resulted from a stroke or other traumatic incident at birth. This brain injury caused a severe seizure disorder that could not be controlled with medications and resulted in significant weight loss, vomiting, and diarrhea. At fourteen years old, Bill underwent a partial hemispherectomy, which removed the entire right side of his brain. This surgery completely resolved Bill's severe seizure disorder but left him with other medical issues; he has partial paralysis on the left side of his body; a blind spot in his left eye; cannot do math; cannot understand the denominations of money or manage his finances; cannot enter into a contract; cannot drive; and cannot be relied on to understand the severity of emergencies or react appropriately to them. Bill also occasionally struggles with impulse control; telling the difference between reality and fiction; and has been diagnosed with intermittent explosive disorder, which may result in aggressive or violent behavior if he feels stressed or "backed into a corner." R. 134, PID 969–70. However, Bill is a functional reader, communicates clearly, dresses himself, and largely manages his own personal hygiene.

Bill lived with his parents until he was about twenty, when his younger brother went to college and Bill told his parents that he, too, wanted to be more independent. Bill's parents found a house in downtown Sevierville, Tennessee, which is a town Bill knew well and liked because of the numerous attractions. Bill lived in the Sevierville house without assistance for about three years, but then began confusing reality with an American Western soap opera and believed that he

was part of the show. The Noreds brought Bill back to their home in Knoxville and had him evaluated by medical professionals, who diagnosed him with intermittent explosive disorder and committed him to the Clover Bottom Middle Tennessee Mental Health Institute in Nashville, Tennessee, where he remained for twelve years. Clover Bottom employees determined that Bill could not have a roommate because he touched his roommate's things, became agitated when other people touched his things, and "just could not function in a room with another person." *Id.* at 972.

Bill moved into home and community-based care in approximately 2013, after Clover Bottom was ordered to close. He enrolled in the 1915(c) Medicaid Home and Community-Based Services ("HCBS") Waiver program, a federally funded program that pays for medical services for individuals who prefer to remain in their homes and communities, rather than in institutionalized care. DIDD administers the 1915(c) waiver program in Tennessee, and Bill's particular waiver—the "comprehensive aggregated cap waiver"—has no limit on the amount of care or services he is entitled to receive. *Id.* As part of the 1915(c) program, DIDD contracted Engstrom Services, Inc. ("Engstrom") to be Bill's Independent Support Coordinator, or "ISC."[1]

---

[1] As the Tennessee agency that oversees the provision of care for disabled Tennesseans, DIDD provides two types of services: direct care through state-run intermediate care facilities ("ICFs"), and indirect care by funding providers who support individuals in their homes through the Medicaid waiver program.

To provide indirect care to patients such as Bill, DIDD "contract[s] with providers that will actually perform [] the direct care or provide services in the person's home or in the community" across the state. R. 135, PID 1101. DIDD also contracts with ISCs that help patients identify DIDD-authorized provider agencies by providing them with a list of potential providers. After the patient selects from this pre-authorized list of qualified and willing providers, DIDD contracts with and pays the provider, and then provides oversight of the quality of care. If the patient requires a new provider or additional staff, the ISC will search for DIDD-approved providers and will pass along a list of interested providers to the patient. The patient and/or conservators have the final say over which authorized provider is selected for services.

ISCs also create annual Individual Support Plans ("ISPs") for the patient, which "provide a comprehensive description of the person supported and the services required to meet his or her needs." ECF No. 21, PID 37. As a representative from Bill's ISC testified, the ISP is designed to "capture what's important to Bill, what's important for Bill, what kind of help, supports he needs, risks and things of that

After Bill was released from Clover Bottom, Engstrom helped Bill locate an apartment in Nashville, where he was able to live alone and receive assisted-living services paid for by DIDD and provided by a DIDD-approved agency called Benchmark. Bill received "Level 6" services at this time, which meant that he was provided two staff for twenty-four hours a day, seven days a week.

After about eighteen months in Nashville, Bill became unhappy so far away from his parents. The Noreds moved Bill back to his previous home in Sevierville but had to switch providers because Benchmark did not service East Tennessee. Engstrom helped the Noreds find New Haven, LLC ("New Haven"), which became Bill's new, DIDD-approved provider in Sevierville.

Bill was happy in his Sevierville home. He enjoyed interacting with the community and spent the majority of his days wandering around town, seeing the Sevierville attractions, eating at favorite restaurants, and making purchases with an allowance provided by his parents. He also greatly enjoyed his independence.

While Bill lived in Sevierville, New Haven provided a variety of services: attendants fixed his meals, ensured that he took his medications, helped him with cleaning the home and remembering certain hygienic tasks, drove him and escorted him wherever he wanted to go around town, and were generally available in case of an emergency.[2] Additionally, the Noreds maintained

---

nature, [and] goals." R. 134, PID 1079. The ISC drafts a patient's ISP after consulting with the patient, the patient's family, and the patient's current providers and staff (collectively, the patient's "Circle of Support"). The Circle of Support then reviews the ISP and makes any necessary changes. Once the Circle of Support approves the ISP, the ISC submits it to DIDD for final approval.

[2] These services are collectively referred to as "support-living services," which involve staff coming to a patient's home to assist with personal care, and "community-based day services," which involve staff taking the patient into the community to engage in activities that the patient enjoys. R. 135, PID 1126.

surveillance cameras in Bill's Sevierville home, which allowed them to look in on him whenever they wished.

In late 2015, the Noreds began to notice that Bill was exhibiting strange behaviors. He would occasionally call his parents in tears "saying that his staff was hurting him, that they were being mean to him, that they wouldn't let him go out, they wouldn't fix him his food, all sorts of just really unusual things." R. 134, PID 995. The Noreds began to review the camera footage in Bill's house, and Mrs. Nored believed from the footage that Bill "was being verbally abused, talked down to, called names, just all kinds of little things that made him extremely uncomfortable." *Id.* at 996. The Noreds complained multiple times to New Haven's owner and director, Gary Hooks, but kept New Haven as a provider. The Noreds continued to experience issues with New Haven through 2016 and 2017, and DIDD ultimately conducted two investigations of New Haven's services in response to the Noreds' complaints—substantiating several of the allegations against certain male caretakers for neglect, emotional abuse, and physical abuse.[3]

Meanwhile, in approximately December 2016, New Haven submitted an intent-to-discharge letter to the Noreds requesting to discontinue services to Bill due to a "breakdown" in

---

[3] Specifically, on December 12, 2016, DIDD conducted a review of complaints against five New Haven employees and substantiated allegations of supervision neglect against three of them (who were "less than alert or sleeping while on duty while working with Bill on multiple different dates and times") and one allegation of emotional abuse against one of them (who had "not le[ft] Bill alone when he was visibly upset, which caused [him] to attack" a staff member). ECF No. 17, PID 97–98. The December 2016 review also concluded that one allegation of physical abuse could not be substantiated.

On July 19, 2017, DIDD conducted a review of complaints against three New Haven Employees and substantiated that all three had committed supervision neglect (by either "leaving [Bill] alone or unattended in his home for excessive amounts of time" or by "being less than alert or sleeping while on duty on unknown dates and at unknown times"). *Id.* at 135. Additionally, DIDD found that one employee had physically abused Bill by "pushing him down two times during a behavioral episode which occurred on" June 20, 2017. *Id.*

communication.[4]  R. 135, PID 1255–56.  After submitting the intent-to-discharge, New Haven continued to provide services through October 2017 while Engstrom searched for a new provider for Bill.

Engstrom had not found Bill a new provider by May 2017, when Bill's ISP was renewed. Alhough New Haven was listed as Bill's provider on his 2017–18 ISP, New Haven did not attend the annual Circle of Support meeting or sign the ISP.  Mrs. Nored explained in a handwritten note on the ISP that she had "requested New Haven staff not be present at this meeting because it was in Bill's home" and their presence "made Bill very upset."  R. 17, PID 46–47.

In July 2017, after DIDD substantiated an allegation of abuse and several allegations of neglect by New Haven employees, *see supra* fn 4, the caretaker who had been found to have physically abused Bill sent the Noreds a letter stating:

> Mr and Mrs Nored,
>
> I want you to know that you have accused the wrong person, I am not a person to be messed with.  I am letting you know that I have contacted the EEOC, Labor

---

[4] A review of the DIDD investigative reports suggests that many New Haven caretakers found their work for the Noreds to be difficult and their responsibilities unclear.  For example, several of the caretakers who were found to have neglected Bill by falling asleep admitted that they did so, but explained that it was because there was often "nothing to do but clean the house."  ECF No. 17, PID 86; *see also id.* at 107 ("Browning said the reason he has dozed off is because Bill's parents have requested that staff not interfere with Bill or ask Bill to do things.  Browning stated, 'The Nored's have made it to where staff cannot do their job and instead just sit in a recliner until Bill request[s] something.'").  Additionally, several staff found to have neglected Bill by being absent from the house stated that the reason they were not in the house was because Bill would often chase them out or refuse to let them in.  *See id.* at 107 ("Browning said that when he gets to the home Bill is usually waiting at the door with a weapon for night staff and doesn't put it down until day staff enters the home.  Browning said he goes out to his car when Bill becomes aggressive," and that "Bill had yelled at him numerous times to 'Get the fuck out of my house.'"); *id.* at 119 ("Berry said she will ask staff why they are outside and they tell her that Bill tells them to get the 'fuck out of his house and tries to hit them'").

Bill also appeared to be particularly afraid of, and often hostile toward, Black staff.  *See, e.g.*, *id.* at 104 ("Bill said he did not want [a certain] staff . . . in his home . . . because he was black (African American). Bill said he was afraid of black people and that they '[s]care the living daylights out of [him]'"); *id.* at 110 ("Ms. Jean reports Bill is scared of black staff and has a difficult time sleeping while they are present"); *id.* at 134 ("[Staff] said that Bill cursed (called him a 'dick sucker' and a 'n*gger') him out and asked him to leave his home").

> Board, and the Office of Discrimination.  Expect a law suit lady, how dare you teach your son to be so racist, the developmentally challenged field is one that I love but now you have jeopardized that for me and I am not handling it well. Understand that I know your address if things do not happen as I wish I will be visiting you.  And no that is not a threat it is a promise.

*Id.* at 138.  After receiving this letter, and in part due to a caretaking incident at Clover Bottom, prior to New Haven's contract, "where [Bill] was attacked by two or three black men and physically, sexually abused" by them, Bill requested that "he not have any more black men be on his staff."  R. 134, PID 1026.  Bill also had a strong preference for female staff because he was more comfortable with them.  *Id.* at 1027.  Mrs. Nored communicated Bill's racial and gender preferences to New Haven in the summer of 2017.  *See id.* at 1027–28.

After two additional incidents with New Haven staff in fall 2017—one in which staff allegedly abandoned Bill in a restaurant for a significant amount of time and one in which staff got into a physical altercation with Bill after he refused to take his medication—the Noreds removed Bill from the Sevierville home and took him to their own home in Knoxville in October 2017.  The Noreds also filed a lawsuit in state court against New Haven.[5]  *Id.* at 1063.

After the Noreds moved Bill to their Knoxville home, New Haven initially attempted to continue services by picking Bill up from Knoxville and taking him to Sevierville—the only location where it was authorized by DIDD to bill for its time—but, according to Hooks, New Haven stopped attempting to service Bill because the Noreds "berated" the staff that arrived, including threatening to call the police if the staff arrived to provide services and actually doing so one occasion, and staff "were literally starting to refuse to go, threatening to quit."  R. 13, PID 1260–61.  The Noreds also requested that New Haven service Bill with primarily female, non-

---

[5] This lawsuit was ultimately dismissed on July 5, 2018, because it was deemed to be a medical malpractice case and the Noreds had failed to meet certain procedural requirements for filing such claims.

African American staff, and Hooks testified that these requests "create[d] a problem for . . . staffing the home." *Id.* at 1262. Additionally, the Noreds were directed by their attorney in the state lawsuit not to have any communication with New Haven or their staff during the pendency of the legal proceedings. At some point after October 2017, the Noreds contacted DIDD's Regional Director for East Tennessee and requested that someone facilitate a meeting between DIDD, the Noreds, and New Haven to maintain a provider through this difficult time. *Id.* at 1004–05. But for reasons that are unclear from the record, a meeting involving the Noreds never took place.[6] New Haven ceased providing services to Bill in October 2017.

Although New Haven did not provide Bill services after October 2017, it remained listed on Bill's ISP as his "official" provider until May 2018, when it came time to renew the ISP. At the Noreds' request, New Haven did not attend the May 2018 ISP meeting. Nor did a New Haven representative sign the 2018 ISP. Accordingly, New Haven was not carried over from the 2017–18 ISP as Bill's official provider, and DIDD was the only "provider" listed on Bill's 2018–19 ISP because no other provider had been found for Bill. No type of home care was listed on the ISP. Mrs. Nored handwrote into the 2018–19 ISP an objection stating that she disagreed with the lack of a provider listed, "which should by law be New Haven." *Id.* at 78.

In August 2018, the Noreds submitted an amended ISP to DIDD requesting supported-living and community-based day services. DIDD denied the request because the ISP failed to

---

[6] However, Hooks testified that New Haven did participate in a resolution process with a DIDD representative who "emphatically" told New Haven that "there has to be a continuity of service," and that New Haven would be "fined daily" and that the state "would step in and pull [its] license" if New Haven refused to provide services. R. 135, PID 1263. It is unclear from the record whether New Haven was ever fined for failing to provide service to the Noreds, although Hooks testified that New Haven continued to be a licensed provider as of the date of trial.

"identif[y] a willing provider contracted with DIDD." ECF No. 21, PID 41. DIDD also denied the Noreds' similar requests in 2019 and 2020 for the same reason.

**B.**

DIDD has not provided Bill with supported-living or community-based medical care or funding since October 2017. However, DIDD has continued to pay Engstrom to serve as Bill's ISC, and Engstrom has continued to search for a provider. From 2017 to 2018, Enstrom sent approximately monthly emails soliciting potential providers and contacted a total of fifty-one providers about providing direct services to Bill in the Sevierville and/or Knoxville areas. Some providers showed initial interest and progressed to the "meet and greet" stage, but none progressed beyond that point. An Engstrom representative testified that providers refused to service Bill for a variety of reasons: the desired locations were out of range or otherwise too difficult to staff, the providers could not provide individual or 1:1 care, and/or the providers were unwilling to service Bill's home given the Noreds' "nonnegotiables," such as the maintenance of 24/7 surveillance cameras.[7] The Engstrom representative testified, however, that several potential providers showed an interest in caring for Bill in communal homes and/or at locations outside of Sevier county. Engstrom contacted an additional thirty-five providers from January 2019 through June 2019, most of whom responded that they did not have the staff, could not service the Sevierville area, or could not support a patient with needs as severe as Bill's.

In 2019, DIDD took the unusual step of contacting approximately forty-two providers directly (bypassing Engstrom), but none would provide services to Bill. *See id.* at 1140–42; 1143

---

[7] An Engstrom representative testified that one of the Noreds' "nonnegotiables" was an expressed desire for female staff and for "no African American males in the house." R. 135, PID 1217. However, Mrs. Nored testified that she only expressed Bill's racial/gender preferences to "one" potential provider during a meet-and-greet, and the provider indicated that it could not serve Bill for reasons unrelated to the gender/racial preference. *See* R. 134, PID 1026–27.

(noting that contacting providers directly is not something DIDD usually does). Five of these forty-two "did not respond at all," twenty-one "said no," and sixteen responded that they could provide services under certain circumstances, such as Bill's willingness to relocate and/or live in a communal home. R. 135, PID 1142.

Since October 2017, Bill has been living in his parents' home in Knoxville and is under their care. Bill's parents are in their seventies and are themselves in poor health: Mrs. Nored is confined to a wheelchair and has had multiple mini strokes, and Mr. Nored suffers from two types of cancer and is undergoing cancer treatment. Bill is unhappy and feels confined in his parents' home. It is not safe for him to walk around due to the rural location close to the road, and Bill's parents cannot provide the degree of care and attention that Bill was receiving in Sevierville. DIDD has refused to send its own employees to Sevierville or Knoxville because it does not provide direct care to individual homes; it only provides direct care in its established intermediate care facilities.[8] And although the Noreds looked into creating their own care agency so that they could become DIDD-approved, funded-care providers, they had to abandon that application due to their health issues.

Since October 2017, the Noreds have occasionally paid individual caregivers to take Bill out during the day, but they do not have consistent or DIDD-funded care. At the time of the trial in November 2020, Engstrom was still contacting providers monthly and still without result. In its appellee brief, DIDD confirmed that Bill is still enrolled in the Medicaid waiver program and is thus entitled to services.

---

[8] According to TennCare, which is the state entity that administers Tennessee's Medicaid waiver program, the ICFs are available to Bill because he is a 1915(c) home-and community-based-services waiver recipient, but Bill has no obligation to accept an ICF placement. TN Division of TennCare, 1915(c) HCBS Waivers, https://www.tn.gov/tenncare/long-term-services-supports/persons-with-intellectual-disabilities-receiving-services-in-the-1915-c-hcbs-waivers.html.

**C.**

In August 2019, the Noreds brought this action against DIDD and its Commissioner, Brad Turner, alleging that DIDD's failure to provide Bill with medical care or funding from October 2017 onward violates the ADA, Rehabilitation Act, Medicaid Act, and 42 U.S.C. § 1983. After the district court dismissed several claims for procedural reasons, the case proceeded to a bench trial on the Noreds' remaining claims. The district court determined that DIDD had not violated the Medicaid Act, ADA, or Rehabilitation Act.

Relevant to this appeal, the district court determined that DIDD satisfied its obligations to provide medical assistance to Bill under 42 U.S.C. § 1396d(a) of the Medicaid Act by being "willing and able" to pay for Bill's services if the Noreds would agree to a provider, and that the providers' unwillingness to serve Bill in his Sevierville or Knoxville homes was "not the fault of DIDD," but was instead due to "the various restrictions that [the Noreds] have placed on who can provide care and where the care is provided." R. 143, PID 1455.

The Noreds appealed.

**II.**

In an appeal from a district court's judgment after a bench trial, this panel reviews "the district court's findings of fact for clear error and its conclusions of law *de novo*." *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 547 (6th Cir. 2010) (quoting *Lindstrom v. A-C Prod. Liab. Trust*, 424 F.3d 488, 492 (6th Cir. 2005)).

The panel may reverse a factual finding for clear error "when the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Chesnut v. United States*, 15 F.4th 436, 441 (6th Cir. 2021) (quoting *Max Trucking, LLC v. Lib. Mut. Ins. Corp.*, 802 F.3d 793, 808 (6th Cir. 2015)).

**III.**

The Noreds allege that DIDD's failure to provide funding or direct medical services to Bill after October 2017 violated § 1396a(a)(8) and (10) of the Medicaid Act, 42 U.S.C. § 1396a.[9] Congress passed Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* ("the Medicaid Act") in part to provide "medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396-1. States that receive Medicaid funds must administer medical-assistance programs in compliance with federal requirements. *Id.* § 1396a(a). Under § 1396a(a)(8), a state plan for medical assistance must "provide that all individuals wishing to make application for medical assistance under the plan shall have the opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." *Id.* § 1396a(a)(8). Under § 1396a(a)(10), a state plan for medical assistance must "provide . . . for making medical assistance available." § 1396a(a)(10). "Medical assistance" means, in relevant part, "payment of part or all of the cost of [eligible] care and services or the care and services themselves, or both."[10] *Id.* § 1396d(a).

We have decided two significant cases interpreting the definition of "medical assistance": *Westside Mothers v. Olszewski ("Westside Mothers II")*, 454 F.3d 532 (6th Cir. 2006) and *Brown v. Tennessee Department of Finance and Administration*, 561 F.3d 542 (6th Cir. 2009).

*Westside Mothers II* involved a suit by several advocacy groups seeking to compel the state of Michigan to provide, under § 1396a(a)(8) and (10), direct medical screening, diagnostic, and

---

[9] Section 1983 creates a private right of action to sue for a violation of 42 U.S.C. § 1396a(a)(8) and (10). *Waskul v. Washtenaw County Community Mental Health*, 979 F.3d 426, 448 (6th Cir. 2020).

[10] DIDD does not dispute that Bill's requested services are eligible services under § 1396d(a).

treatment services to eligible children. 454 F.3d at 535–36. At the time, "medical assistance" was defined in the Act to mean "payment of part or all of the cost of the [enumerated] services . . . for individuals." *Id.* at 540 (quoting 42 U.S.C. § 1396d(a)). Accordingly, the court rejected the plaintiffs' arguments that the Act required states to provide direct services, and instead held that "what is required is a prompt determination of eligibility and a prompt *payment* to eligible individuals to enable them to obtain the necessary medical services." *Id.* (citing 42 C.F.R. §§435.911, 435.930) (emphasis added) (holding that the plaintiffs had failed to state a claim under the Act because they sought to compel the state to provide services rather than payment).

*Brown* expounded on *Westside Mothers II* by holding that Tennessee did not violate the Medicaid Act by putting a class of disabled Tennessee residents, who were eligible for Medicaid services, on a waiting list to receive those services. 561 F.3d at 545–47 ("[A]bsent more, a waiting list for waiver services does not violate federal law because the state's duty is to pay for services, not ensure they are provided. . . .).

In 2009, shortly after *Brown*, Congress revised the definition of "medical assistance" to encompass payment for services, the services themselves, or both. An accompanying House Report explained:

> Section 1905(a) of the Social Security Act [codified at what is now the Medicaid Act, 42 U.S.C. § 1396d(a)] defines the term "medical assistance." The term is expressly defined to refer to payment but has generally been understood to refer to both the funds provided to pay for care and services and to the care and services themselves. The Committee, which has legislative jurisdiction over Title XIX of the Social Security Act, has always understood the term to have this combined meaning. Four decades of regulations and guidance from the program's administering agency, the Department of Health and Human Services, have presumed such an understanding and [] Congress has never given contrary indications.
>
> Some recent court opinions have, however, questioned the longstanding practice of using the term "medical assistance" to refer to both the payment for services and the provision of the services themselves. These opinions have read the term to refer

only to payment; this reading makes some aspects of the rest of Title XIX difficult and, in at least one case, absurd. If the term meant only payments, the statutory requirement that medical assistance be furnished with reasonable promptness "to all eligible individuals" in a system in which virtually no beneficiaries receive direct payments from the state or federal governments would be nearly incomprehensible.

Other courts have held the term to be payment as well as the actual provision of the care and services, as it has long been understood. The Circuit Courts are split on this issue and the Supreme Court has declined to review the question. To correct any misunderstandings as to the meaning of the term, and to avoid additional litigation, the bill would revise section 1905(a) to read in relevant part: "The term 'medical assistance' means payment of part or all of the cost of the following care and services, or the care and services themselves, or both." This technical correction is made to conform this definition to the longstanding administrative use and understanding of the term. It is effective on enactment.

H.R. Rep. No. 299, 111th Cong., 1st Sess. 2009, at 645–50 (Oct. 14, 2009), also available at 2009 WL 3321420, at \*694–\*95.

Our circuit has commented on this change only once. In 2010, we addressed a suit in which Tennessee state officials sought to vacate a consent decree that required Tennessee to provide a class of minors direct health benefits under the Medicaid Act. *John B. v. Goetz*, 626 F.3d 356, 358 (6th Cir. 2010). In providing background on our Medicaid caselaw, we summarized *Westside Mothers II* and *Brown*'s holdings regarding the definition of "medical assistance" under 42 U.S.C. § 1396d(a), *id.* at 360–61, and noted in dictum that "[t]he definition of 'medical assistance' has changed since we decided *Westside Mothers II*, but the new definition does not affect this holding because a state may still fulfill its Medicaid obligations by paying for services."[11] *Id.* at 360 n.2.

We have not issued an authoritative opinion determining whether *Westside Mothers II* controls the definition of "medical assistance" under § 1396d(a) after Congress amended the

---

[11] Despite the speculation in *Goetz* regarding the definition of "medical assistance," our ultimate holding in that case had nothing to do with 42 U.S.C. § 1396d(a); we vacated only the portion of the consent decree relying on an unrelated section of the Act that had been found to have no private right of action. 626 F.3d at 362–63.

statute, and district courts in our circuit have split on the issue. *Compare K.B. by Next Friend T.B. v. Mich. Dep't of Health & Human Servs.*, 367 F. Supp. 3d 647, 657 (E.D. Mich. 2019) ("As referenced by the court [in *Goetz*], the current definition of 'medical services' gives a state three different options: provide services directly, pay for services, or both provide and pay for services. As such, the 2010 amendment to the definition does not disturb the holding in *Westside Mothers*. . . . [A] state may choose to only pay for services."), *with John B. v. Emkes*, No. 98-cv-0168, 2011 WL 795019, at *5 (M.D. Tenn. Mar. 1, 2011) ("Under this amendment, whether a particular provision of the Medicaid Act requires payment for services or the provision of the services themselves is not controlled by the old definition of 'medical assistance' as referring only to financial assistance. Indeed, the legislative history behind this amendment clearly shows that Congress intended to clarify that where the Medicaid Act refers to provision of services, a participating State is required to provide (or ensure the provision of) services, not merely to pay for them.").

## A.

The district court, in holding that DIDD did not violate § 1396a(a)(8) and (10) of the Medicaid Act by being willing to pay for medical providers, observed that "[t]here is no case at this time that holds that if the state is not actively paying for medical services then instead it *must* provide the services themselves." R. 143, PID 1451–52. The court then held that § 1396d(a) "gives a state three different options: provide services directly, pay for services, or both provide and pay for services." *Id.* (quoting *K.B.*, 367 F. Supp. 3d at 657). The court noted that "both DIDD and the ISC have made extensive efforts to find a provider for Bill, to no avail, due to the various restrictions the Noreds have established," including the racial/gendered preferences and the Noreds' refusal to relocate Bill out of Sevierville or Knoxville, and concluded that DIDD satisfied

its § 1396a(a)(8) and (10) obligations by "maintain[ing] that it was willing and able to pay for the requested services if the Noreds were able to specify a provider." *Id.* at 1455. Citing 42 C.F.R. § 431.51(b)(1),[12] the district court concluded that "DIDD may not force the Noreds to choose a provider for their son . . . [b]ut if the criteria the Noreds have imposed eliminate any available providers, then that is a decision that rests on the Noreds—not DIDD." R. 143, PID 1452–53.

**B.**

On appeal, the Noreds agree that "there is no case at this time that holds that if the state is not actively paying for medical services then instead it must provide the services themselves." Appellants' Br. at 31, 33. But, citing the House Report explanation for Congress's 2010 amendment to the Medicaid Act, they maintain that "to find otherwise would contradict the legislative intent behind the change in definition of the term medical assistance." *Id.* at 33. The Noreds also argue that they did not place "non-negotiable race and gender restrictions on all prospective providers;" that even if they had, those preferences were not included in his 2017–18 ISPs or circulated by DIDD in July 2019; and that the "overarching reason[s]" that providers turned Bill down were that "they didn't service the Sevierville area, did not have enough staff, or could not support Level 6 care on an individual basis."[13] *Id.* at 34–36. Finally, the Noreds argue that Bill "is not seeking to remain in a nursing home or other care facility that has been decertified or to have a decertified provider continue providing him with care," but "simply wishes to remain

---

[12] This regulation states that beneficiaries "may obtain Medicaid services from any institution, agency, pharmacy person, or organization that is (i) qualified to furnish services; and (ii) willing to furnish them to that particular beneficiary." 42 C.F.R. § 431.51(b)(1).

[13] The Noreds explain that Bill's racial and gender preferences were not due to prejudice, but to his "physical[] and sexual[] abuse by three African American men" while institutionalized at Clover Bottom. Appellant's Br. at 34. "Given this experience and his disabilities, Bill became afraid of all African American men and could not understand that the race and gender of his three assailants were unrelated to the abuse that he suffered." *Id.* at 34–35.

part of the Sevierville community, where he had friends, interacted with the community, and was able [to] live a relatively independent lifestyle despite his disabilities." *Id.* at 39.

**1.**

We need not decide the legal issue whether a state agency responsible for administering the Medicaid waiver program may satisfy its obligations merely by being willing to pay for "medical assistance" even when none is available, because we conclude that, on this record, the district court did not err in finding that DIDD did not violate § 1396a(a)(8) and (10)'s requirements that it furnish "medical assistance" "with reasonable promptness" and "provide for making medical assistance available" by failing to provide direct services to Bill when a willing, qualified provider could not be found and paid due primarily to the Noreds' "nonnegotiable" requirements.

After a bench trial, the district court made the following findings of fact, which we may only reverse for clear error: that DIDD, by itself and through its agent Engstrom, expended significant effort attempting to secure a qualified, willing provider for Bill; that Engstrom began searching for a new provider as soon as New Haven submitted its intent-to-discharge in 2017; that the Noreds prevented New Haven from servicing Bill in either Sevierville or Knoxville while DIDD searched for a new provider; that through approximately monthly emails, Engstrom inquired of numerous qualified providers over the course of 2017 to 2019, including DIDD taking the unusual step of contacting providers directly in 2019; and that while many of the potential providers indicated initial interest in servicing Bill and progressed to the meet-and-greet stage of becoming a provider, none of them were ultimately willing to take him on as a client due to the Noreds' "non-negotiable conditions," including "only consider[ing] providers who could service

Bill's home in Sevierville," and that these providers declined service under the Noreds' conditions "despite these efforts by Engstrom and DIDD."[14] *See id.* at 1446–47.

Of these factual findings, the Noreds dispute only that Bill's racial/gendered preferences were part of their "nonnegotiables." And although they are correct that the majority of providers rejected them because of their remote location and/or staffing issues, the fact remains that multiple providers were willing to accommodate Bill if the Noreds would agree to certain concessions, such as moving Bill out of Sevierville/Knoxville or removing the 24/7 security cameras. An Engstrom agent testified that the Noreds' "conditions and nonnegotiables . . . affect [Engstrom's] ability to locate a willing provider." *Id.* at 1219. The Noreds' repeated refusal to make non-medical concessions to otherwise qualified, willing providers—coupled with their refusal to allow New Haven to service Bill at Knoxvilee or Sevierville and DIDD and Engstrom's consistent efforts on their behalf for years—supports the district court's finding that DIDD was not responsible for failing to locate a willing, qualified provider for Bill.

In affirming, we do not decide the correctness of the district court's view that a state may satisfy its obligations under 42 U.S.C. § 1396a(a)(8) and (10) by merely being willing to pay for medical assistance. We simply hold that, on this record, the district court did not err in concluding that DIDD did not fail to "provide for making medical assistance available" to Bill or to furnish it

---

[14] The district court focused heavily on the racial/gendered staffing requests. *See, e.g.*, R. 143, PID 1452 ("Obviously, if the Noreds place unreasonable and unfortunate restrictions based on sex and race of the person who can provide their son the needed services, then the Noreds should not complain when DIDD cannot find any willing provider. And, it is no surprise that the Noreds cannot find one either.").

This issue is quite complicated and the district court did not engage with the Noreds' argument that Bill did not have the capacity to separate his past trauma from the physical description of the people who hurt him. In any event, despite the district court's focus on this issue, the record does not demonstrate that potential providers, other than New Haven, refused to work with Bill *because* of his racial/gender preferences. However, there is considerable evidence that the Noreds' refusal to compromise on other nonnegotiables—such as location and the security cameras—was a significant obstacle for new providers and that flexibility on these nonnegotiables could have resulted in direct care.

"with reasonable promptness." § 1396a(a)(8) and (10); *see Waskul*, 979 F.3d at 450 (stating that a Medicaid beneficiary may "not show a violation of §§ 1396a(a)(8) and (10) simply because they did not get to choose their own providers, as nothing in these provisions evidently requires Plaintiffs to be provided services by the providers of their choice").

**2.**

The Noreds next argue that the district court erred in finding that DIDD did not violate § 1396a(a)(8) and (10) by allowing New Haven to be removed from the 2018 ISP as Bill's "official" provider.[15] They argue that, "by allowing the removal of the provider agency hired to provide Bill with the care and services that he is qualified to receive with no other provider in place and by refusing to provide Bill with care directly, [DIDD] prevent[ed] Bill from receiving medical assistance with reasonable promptness." Appellants' Br. at 42.

We discern no error. The district court found that "[t]he Noreds placed conditions on the type of [New Haven] staff who were allowed to provide services: no men and no African Americans. New Haven was unwilling and unable to comply with those conditions. New Haven did not have the available employees to staff the home as the Noreds requested. The Noreds refused to allow New Haven to provide any services in their Knoxville home, even threatening to call the police if New Haven employees came to the house." R. 143, PID 1446.

The Noreds do not challenge these factual findings on appeal. Additionally, there is no evidence that DIDD caused New Haven to be excluded from the ISP or was otherwise responsible for the exclusion of supported-living and community-based day services. To the contrary, Hooks testified that DIDD "emphatically" informed New Haven that it had to provide continuity of

---

[15] The Noreds do not argue that the removal of New Haven from the 2018 ISP violated any implementing regulations, internal DIDD policies/procedures, or other laws aside from 42 U.S.C. § 1396a(a)(8) and (10).

service until a willing provider could be found and that there would be consequences for New Haven failing to provide services to Bill. R. 135, PID 1272. On this record, and coupled with the district court's factual finding that the Noreds functionally prevented New Haven from providing services to Bill at either the Sevierville or Knoxville locations, we affirm the district court's determination that DIDD did not violate 42 U.S.C. § 1396a(a)(8) and (10)'s mandates to "make medical assistance available" and "furnish [it] with reasonable promptness" by failing to prevent the removal of New Haven from Bill's 2018–19 ISP.

## C.

Finally, the Noreds appeal the district court's determination that, were DIDD to provide direct services to Bill in his Sevierville or Knoxville homes, such services would constitute an impermissible "fundamental alteration" of DIDD's program. The "fundamental alteration" defense is an exception to ADA and Rehabilitation Act claims that an entity failed to make reasonable modifications for, and thereby discriminated against, a disabled individual. *See* ADA, 42 U.S.C. § 12182(b)(2)(A)(ii); 28 C.F.R. § 41.53. This defense is not available to claims under the Medicaid Act, which is the only Act at issue on appeal.

Although the district court properly analyzed the "fundamental alteration" defense only in the context of the ADA and Rehabilitation Act, the Noreds appear to contend that the district court also analyzed this defense in considering the Medicaid Act claim (which they also refer to as the "42 U.S.C. § 1983 claim"). They request that the panel find that the "'fundamental alteration' defense [] fail[s] in relation to" the Medicaid Act claim. *Id.* at 46.

We agree with the statement of law. However, the district court did not analyze the "fundamental alteration" defense with respect to the Medicaid Act claim. And even if it had, the court also independently found that DIDD did not violate the Medicaid Act because DIDD did not

violate its duty to provide "medical assistance" under §§ 1396d(a) and 1396a(a)(8) and (10). The Noreds did not appeal the determination that DIDD did not violate the Medicaid Act, so the "fundamental alteration" defense does not apply in any event.

**IV.**

For the reasons discussed, we AFFIRM.